IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 5, 2024 at Jackson

**BALDOMERO GALINDO v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 121386   Hector Sanchez, Judge**

_____

**No. E2023-01107-CCA-R3-PC**

_____

Petitioner, Baldomero Galindo, appeals as of right from the Knox County Criminal Court's denial of his petition for post-conviction relief, wherein he challenged his conviction for first degree murder, for which he received a life sentence.  On appeal, Petitioner contends that he was denied the effective assistance of counsel based upon trial counsel's failure to raise a claim of self-defense and his failure to call a witness to testify after learning that the witness failed a polygraph examination.  Following a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Robert L. Sirianni, Jr., (on appeal), Winter Park, Florida; and George W. Thomas (at hearing), Atlanta, Georgia, for the appellant, Baldomero Galindo.

Jonathan Skrmetti, Attorney General and Reporter; Christian N. Clase, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background[1]**

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from Petitioner's direct appeal and delayed direct appeal.  *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987); *State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

*Trial*

On direct appeal, this court summarized the evidence presented at Petitioner's trial, as follows:

This case involves a fatal assault of Heather Lovette, [Petitioner's] former girlfriend. The evidence at trial demonstrated that the victim died as a result of blunt force trauma to her head, which had been inflicted with a hammer.

Barbie Swann testified that she and the victim were best friends from age twelve forward. She said that a week before the victim was killed in August 2005, she moved out of the victim's apartment and into her grandmother's house, "two buildings up" from the victim's apartment. She said she moved because the victim was going to regain custody of her four children. She said that when she and her boyfriend lived in the victim's apartment, [Petitioner], [Petitioner's] brother, and the victim also lived there. She said [Petitioner] was the victim's boyfriend.

Ms. Swann testified that [Petitioner] came to her new residence on August 18 and asked her boyfriend to help him find a place where he and [Petitioner's] brother could live. She said that he stated he did not know where the victim was and asked Ms. Swann's boyfriend to let him know if Ms. Swann said anything about the victim's whereabouts. She said she would not have told him had she known and explained that she understood that the victim did not want to have any contact with [Petitioner].

Ms. Swann testified that she spoke and understood Spanish. She said [Petitioner] was learning to speak English but that he understood it well. She said she and [Petitioner] usually spoke English to each other.

Ms. Swann testified that she went to the victim's apartment around 6:00 or 7:00 p.m. on August 18 to retrieve a few belongings remaining in the apartment. She also said she felt uncomfortable because she knew the victim was trying to get away from [Petitioner] and that she and her boyfriend chose to go to the victim's apartment when [Petitioner] and his brother were away. She said she retrieved some of her property in a box. She said there was a red hammer she had borrowed from the victim in the box. She said she left the hammer on the kitchen table. She identified the hammer as the one that was an exhibit and stated that it was not missing parts of its plastic handle on August 18. Ms. Swann testified that as she and her boyfriend were walking

- 2 -

home, they saw [Petitioner] and his brother returning. She said that her memory was vague but that her boyfriend may have spoken to them for a minute while she went ahead to her new home.

On cross-examination, Ms. Swann testified that she told the police about the hammer. She said that if this was not reflected in the tape of her interview by the police, it would be because "they would have had to cut that part out." She admitted [Petitioner] did not like that she and the victim used drugs together, but she denied suspecting that the victim asked her to move out due to pressure from [Petitioner]. She said she thought the victim and [Petitioner] planned to get married but their plans changed when the victim decided to regain custody of her children. She said the victim wanted to reunite with Michael Leuty because he would help her with the children. She acknowledged telling the police the reason the victim wanted to reunite with Mr. Leuty was that he would provide financial assistance.

Ms. Swann testified that she never saw the victim in a violent situation with Mr. Leuty. She acknowledged that she had seen the victim "run off and [Mr. Leuty] enter the apartment and her not be there." She admitted that she did not like [Petitioner].

Ms. Swann testified that [Petitioner] was upset on August 18 about not knowing the victim's whereabouts. A portion of Detective Huckleby's August 19 taped interview of Ms. Swann was played, after which Ms. Swann acknowledged that she said in the interview that [Petitioner] was not upset. She also admitted that she did not say anything about the hammer in this interview.

On redirect examination, Ms. Swann testified that she was also interviewed by the authorities on August 26 and September 30. She acknowledged mentioning the hammer on September 30, although she said she thought she had mentioned it on August 26. She said she was not asked about a hammer on August 19. She said that when she was shown a photograph of the hammer at a later date, it was in a different condition than it was when she left it on the table.

Michael Leuty testified that he was convicted in Montana of felony burglary, felony accountability to burglary, and felony criminal mischief. He said he served time in prison and completed a boot camp program for the crimes.

Mr. Leuty testified that he met the victim through her sister in 2002. He said that he and the victim were romantically involved and that they began living together in June 2002. He said that the victim's four children also lived in their home and that he assisted in supporting them. He said he lived with the victim "off and on" for three years. He said that the victim had a problem with crack cocaine and that he needed to stay away from crack.

Mr. Leuty testified that he and the victim were separated from February or March 2005 until the victim's birthday on August 7, 2005. He said that he did not know [Petitioner] during this time. He said he moved across the street from the victim on August 8 because he was still in love with her. He said he saw [Petitioner] at the victim's home during this time. He said he and the victim first talked about reconciliation on the following Wednesday, when the victim moved into his home. He said this was approximately August 16 or 17. He said the victim did not leave his home because she did not want [Petitioner] to know where she was.

Mr. Leuty testified that he was working for Jones Woodcrafters at the time and that he worked during the day on August 19. He said the victim was unemployed. He said that he awoke about 6:00 or 6:30 a.m. and that his boss, Michael Pruitt, picked him up around 7:30 or 8:00 a.m. He said the victim was still sleeping in his bed when he left. He said she was lying on her stomach with her head turned to the right and away from the window. He said that he spoke to her before he left and that she acknowledged him. He said he left the victim a note stating that he would see her on Sunday to help her move back into her apartment. He said he did not know whether the victim would be there when he returned that afternoon. Mr. Leuty testified that the only air conditioning in the apartment came from a window unit in Elizabeth [Koelzer's] bedroom.[2]

Mr. Leuty testified that he worked eight or nine hours that day at a job site that was about five miles past Maryville and that he returned home about 6:30 p.m. He said he did not have a key to the apartment, which was locked when he came home that evening. Mr. Leuty testified that [Petitioner's] red Ford F-150 and Ford Probe were both in front of the victim's apartment that morning and when he returned that evening. He said he did not see anyone home at the victim's apartment that evening.

---

[2] The direct appeal's spelling of Elizabeth Koelzer's last name as "Koetzler" appears to be a typographical error. Because trial counsel later clarified at the motion for new trial hearing that the correct spelling is "Koelzer," we have used that name in this appeal.

Mr. Leuty testified that because they were in a bad neighborhood and he had his work tools with him, his boss waited with him. He said he used Mr. Pruitt's cell phone to call Elizabeth to let him into the house but was only able to leave her a voice mail message. He said that he remembered the window to his bedroom at the back of the apartment and that he was able to open it. He said that he stepped onto the bed and that the victim was still asleep. He said that he told the victim he was home and to get up but that she did not respond. He said he ran to the front of the house to open the door for his boss and to get his tools inside. He said he then went back to the bedroom to wake the victim. He said that she was in the same position as she had been that morning and that when he began shaking her, she was unresponsive. He said that he grabbed her wrist and that it was cold. He said that he flipped her over by her shoulder. He said that when he did so, he saw blood everywhere on the bed and in a huge puddle on the floor. He said that he began screaming and stumbled out of the house. He said that he was crying and asked Mr. Pruitt to call 9-1-1. He said that [Petitioner] and his brother were standing across the street watching him cry. He said [Petitioner's] brother left in a truck, that [Petitioner] continued watching him for three or four minutes, but that [Petitioner] left in the Ford Probe before the police arrived.

Mr. Leuty testified that Detective Huckleby interviewed him three times and that he told Detective Huckleby he was not involved in the victim's death. He said that he learned in the third interview that his handprint was in the apartment and that Detective Huckleby arrested him after this interview. He said he was in jail almost thirty days but was released on September 22. He said that he was angry but that he later provided the police with information about the victim's hammer, which he said had been her grandfather's. He said the hammer was red and had a rubber handle. He said he remembered this hammer being in the victim's apartment when they lived together previously. He said the only hammer in Elizabeth [Koelzer's] apartment was his twenty-two ounce framing hammer, which had a wooden handle. He denied hitting the victim with a hammer.

On cross-examination, Mr. Leuty testified that the victim was afraid of [Petitioner]. He said she came to the apartment and stayed inside due to her fear. He said the victim told [Petitioner] to leave her house and waited for three days at the apartment where Mr. Leuty lived for [Petitioner] to leave.

- 5 -

Mr. Leuty testified that when the victim and [Petitioner] lived together, the victim's children were living with the victim's mother. He said that on previous occasions when he lived with the victim, they broke up because "she was getting free cocaine from the Mexicans that she was running around with." He admitted that due to the weather, he did not work on the Thursday before the victim's death. Mr. Leuty acknowledged that he "climbed over one corner of the bed" when he went into the apartment through the bedroom window. He said he did not see the blood under the bed until after he was released from jail.

Mr. Leuty testified that he saw a "shrink" regularly because he had nightmares about finding the deceased victim. He acknowledged that he did not find out how the victim was killed until a couple of weeks after his release from jail on September 22. He acknowledged sending an e-mail to the prosecutor on October 19, in which he described a hammer that belonged to the victim but admitted the email did not say anything about it having been her grandfather's. He acknowledged that he knew on October 19 that [Petitioner] had been charged with killing the victim. On redirect examination, Mr. Leuty said he could not be sure whether he first saw the puddle of blood underneath the bed on August 19 or after he was released from jail.

Janice Gangwer testified that she was employed by the Knoxville Police Department and that in 2005 she was assigned to the Forensic Unit. She said that on August 19, 2005, she responded to the scene of the victim's death, 1347 Alliance Avenue, where she took photographs and collected evidence. She identified several photographs of the scene.

After Ms. Gangwer was accepted over defense objection as an expert in blood spatter analysis, she testified that the blood on the front porch of the home where the victim's body was found consisted of round droplets. She said this indicated that the droplets were dripping from something. She said she collected samples of the blood. She also collected sunglasses with a red stain from the porch, which she sent to the TBI for analysis. She identified a photograph of the inside of the apartment entrance depicting a handprint with a red stain on tile and blood droplets on the floor near the doorframe. She identified another photograph depicting a smear of blood on the storm door. She said that she used amido black to develop the blood in the handprint for identification, photographed it, and removed the tile. She also collected samples of the blood droplets on the floor for analysis. She said

that she did not recall any blood in the living room or kitchen but that they collected cigarette butts from the living room.

Ms. Gangwer testified that the home had three bedrooms. She said there were blood droplets at the doorway to the "middle front bedroom," which was located down a hallway. She said she collected samples of this evidence. She said that the victim's body was found in the back bedroom and that there were blood droplets on the floor of that room. She identified a photograph of the victim, depicting "a significant quantity of blood in [the victim's] hair and her face and saturating her shirt and the bed clothing . . . enough blood to saturate right through the top mattress and down into the box springs," although she said there was no puddle of blood on the floor. She said there was no blood spatter on the walls or the curtain. She said that a spring was missing from a latch on the bedroom window.

Ms. Gangwer testified that there was a wastebasket in the kitchen that contained a black rubber grip. She said the grip was collected and submitted for DNA analysis. She said that there was a claw hammer in a drawer next to the wastebasket.

With respect to another apartment that was identified by other proof as the victim's apartment, Ms. Gangwer testified that she collected a pair of blue jeans with red spots on them. She said she also collected samples from blood stains on the door and wall of the hallway at this apartment. She said this apartment was across the street from the apartment where the victim's body was found. She said she measured the distance between the two apartments as forty-two steps.

Ms. Gangwer testified that she accompanied police investigators to Pleasant Ridge, where they located [Petitioner]. She said [Petitioner] was taken to the police department, where she collected fingerprints from him for comparison. She identified a photograph of [Petitioner] taken around 4:00 a.m. on August 20, which she said depicted a ragged laceration on the right side of his head.

On cross-examination, Ms. Gangwer acknowledged that she did not collect a sample of blood that was on top of the hallway side of the bedroom doorframe where the victim's body was found. She said the wound on [Petitioner's] head was between one and two inches long. She acknowledged that she did not have any of the cigarette butts that she collected analyzed.

She again stated that there was not a large puddle of blood under the bed, but she said there was some blood there.

Michael Pruitt testified that in August 2005, Michael Leuty was one of his employees and that his business "built decks and things of that nature." He said Mr. Leuty worked for him for four or five months and that he provided Mr. Leuty's transportation. He said he picked up Mr. Leuty on August 19 around 7:10 to 7:30 a.m. at a home diagonally across the street from a home that was identified to him as the victim's and that he had been doing so for a week and a half to two weeks. He said that he saw a red F-150 truck and a blue or green car parked at the victim's home that morning and that these vehicles were not usually there. He said that Mr. Leuty did not seem unusual that day, that they worked together all day, and that he brought Mr. Leuty home around 6:30 or 7:00 p.m.

Mr. Pruitt testified that he usually smoked cigarettes with Mr. Leuty when he brought Mr. Leuty home. He said that on August 19, he and Mr. Leuty talked outside and that Mr. Leuty found the apartment door locked. He said that they smoked together and that Mr. Leuty then opened a window with a saw blade. He said he held the window open for Mr. Leuty to crawl inside. He said Mr. Leuty went to the front of the apartment and outside to retrieve his tool bag. He said Mr. Leuty went back inside and started screaming for him to call 9-1-1. He said Mr. Leuty came outside, shaking and talking incoherently. He said Mr. Leuty always wore sunglasses and that he thought Mr. Leuty left them on the porch that evening. He said he was not able to get through to 9-1-1 for about twenty minutes. Mr. Pruitt testified that as Mr. Leuty came from the apartment, two men he did not recognize were walking toward the car and the truck across the street. He said that they appeared to be Hispanic and that one of the men exchanged stares with Mr. Leuty before driving away. He said Mr. Leuty was so disturbed that he was unable to work after August 19.

On cross-examination, Mr. Pruitt testified that the apartment door was usually unlocked. He acknowledged that when he was interviewed on the night of August 19, he told the detective that the people who lived next door were Mexican based upon what someone else told him. He said all he remembered about the people he saw was that they were neither black nor white. He said he was certain, however, that the people were Hispanic.

TBI Special Agent Jennifer Millsaps testified as an expert witness in forensic DNA analysis. She said that she analyzed items of evidence

collected from the scene and compared them with standards collected from the victim, [Petitioner], and Mr. Leuty. She said that there was blood on the sunglasses and the floor tile that matched the victim's DNA profile. She said the probability that the profile matched someone other than the victim exceeded the world population. She said that the reddish-brown stain from the porch matched [Petitioner's] DNA profile and that the probability that the profile matched someone other than [Petitioner] exceeded the world population. She said that the reddish-brown stain from the front door matched [Petitioner's] DNA in some locations but that the results were inconclusive in a few locations.

Knoxville Police Department Detective Joseph Huckleby testified that he was assigned to the Major Crimes Unit and that he investigated the victim's death. He said that he responded to 1349 Alliance Drive about 8:00 p.m. on August 19, 2005. He said that he could not tell from viewing the victim's body how she had been killed, although he could tell she had a head injury. He said her body and hair were in disarray and that there was a large amount of blood.

Detective Huckleby testified that after a witness told him the victim lived across the street, he also investigated at an apartment across the street. He said that no one was home at that apartment but that he found several items of evidence. He said he found a tool handle, a red-handled claw hammer, and stained blue jeans.

Detective Huckleby testified that after learning [Petitioner] was at a location on Pleasant Ridge Road, he traveled there and had contact with [Petitioner] for twenty or twenty-five minutes. He said that [Petitioner] had a bleeding head injury and that [Petitioner] agreed to go to the police station. He said that there was a language barrier because he did not speak Spanish, that he needed a certified interpreter present to interview [Petitioner], and that he photographed [Petitioner's] injury but did not interview him.

Detective Huckleby testified that he later asked [Petitioner] to return for an interview through an interpreter and that [Petitioner] did so voluntarily. He said he interviewed both [Petitioner] and [Petitioner's] brother on August 20. He said that at that point, he did not have any information about how the victim died. He said [Petitioner] claimed to have no knowledge about the victim's death and to have last seen the victim on August 16. He said [Petitioner] claimed to have left for work between 7:45 a.m. and 8:00 a.m. and not to have returned until after he left work between

- 9 -

5:00 p.m. and 5:45 p.m. He said that [Petitioner] first told him that the cut on his head happened at work but that he admitted in a later interview that the victim hit him.

Detective Huckleby testified that he learned from a crime technician that the bloody handprint found at the crime scene belonged to Michael Leuty. He said, however, that he did not see any blood on Mr. Leuty when he talked to him shortly after the crime. He said that he interviewed Mr. Leuty at least three times and that he eventually arrested Mr. Leuty for the victim's murder. He said that in the first interview, Mr. Leuty was unable to explain how his handprint got onto the floor and that he was upset and "elusive." Detective Huckleby identified a hammer that was recovered from a kitchen drawer at the crime scene. He also identified a "black rubber grip" that was taken from the kitchen trash can.

Detective Huckleby testified that after speaking with Agent Millsaps on the telephone and learning that some of the blood samples were [Petitioner's], he interviewed [Petitioner] again. He said [Petitioner] came to the police station voluntarily on September 22. He identified [Petitioner's] waiver of rights form from this interview. He said he followed the procedure for obtaining a certified interpreter for this interview. He said that at the time, he did not know whose blood was on the hammer and that he had not seen any blood on the hammer. He said that after the interview, he immediately had Michael Leuty released and apologized to him. A videotape of [Petitioner's] September 22 statement was played for the jury, in which [Petitioner] admitted hitting the victim on the head with a hammer and claimed that she hit him first.

On cross-examination, Detective Huckleby acknowledged that his written "continuing report" omitted information he learned during the investigation. He said he did not have information from Ms. Swann and Mr. Leuty about the hammer until after [Petitioner] was arrested. He acknowledged that when he was on the scene, he had the hammer photographed and collected despite not knowing how the victim was killed. He also acknowledged that contrary to his earlier testimony, Mr. Leuty claimed never to have touched the victim's body but that he wrote in his report that Mr. Leuty admitted having climbed over the body and having turned it over. He said his report also stated that Mr. Leuty claimed he had not looked at or seen anything on the victim's body. He also admitted that his report omitted information about a child having seen [Petitioner] and [Petitioner's] brother at the scene and said he did not include the information

- 10 -

because he was unable to confirm it due to the child's mother not cooperating.

Detective Huckleby testified that he interviewed Elizabeth [Koelzer] four times. He denied any memory of saying to her that he thought she was responsible for the victim's death. After a portion of one of the video recorded interviews was played, he said he was unsure whether his statement to her, "I still think you did it, all I [have] to do is prove it," was about the killing.

Detective Huckleby admitted that when he went to find [Petitioner] in the early morning of August 20, he and other officers went to an identified location. He said he did not know who may have had their guns drawn but that he did not. He admitted [Petitioner] was "being detained for an investigation" and was taken to the police department in handcuffs. He also admitted that [Petitioner] was taken to the squad room on a secure floor of the building. He acknowledged that [Petitioner] returned voluntarily to give a blood sample and again for an interview.

Detective Huckleby acknowledged that the police lie to suspects "all the time" as an investigative technique. He admitted telling [Petitioner] he would not hold anything said in confidence against [Petitioner]. He admitted he knew [Petitioner's] admissions would be used against him but said he meant he would not personally hold anything against [Petitioner]. He said [Petitioner] told him that he had gone to the apartment across the street and that the victim threatened to kill him if he did not leave. Detective Huckleby said [Petitioner] claimed he "kind of blacked out" when the victim hit him and that he then saw the hammer and reacted by hitting the victim. He said [Petitioner] claimed not to remember how many times he hit the victim. He said that after [Petitioner] said he left the hammer "at the side of the apartment," he asked [Petitioner] if the hammer was in the kitchen drawer and that [Petitioner] said it was. He said that he asked whether there was a piece in the trash can and that [Petitioner] said, "Probably. I don't remember." He said [Petitioner] claimed he had not given this information during the first interview because he was scared.

Detective Huckleby clarified that in the last interview, [Petitioner] mentioned the hammer first. He admitted that he already knew about the hammer. He said he did not recall [Petitioner's] stating where he was in the house when the victim hit him with the hammer.

- 11 -

Dr. Darinka Mileusnic-Polchan testified as an expert in forensic pathology.  She said she reviewed the records of the victim's autopsy, which was performed by another doctor.  She said the significant finding was blunt head trauma.  She said the victim was hit multiple times, with three main lacerations on the right side.  She said that one of these lacerations was slightly curved and about one inch long.  She said that the curved shape indicated that the blunt object used to inflict it had a slightly curved edge, which she said was consistent with the head of a claw hammer depicted in a photograph exhibit that had been identified previously as the hammer from the kitchen drawer.  She said that scalp injuries produced very heavy bleeding and that blood would have been transferred onto the hammer.  She identified a second wound, which also had a curved appearance consistent with the victim's having been struck with a hammer similar to the photographed hammer.  She also identified a third wound on the right side of the victim's head.  Dr. Mileusnic-Polchan testified that one wound was on the left side of the victim's head.  She said that its appearance was similar to the three wounds on the right side of the head and that it was consistent with having been struck by the head of a hammer.

Dr. Mileusnic-Polchan testified that there were three wounds on the back of the victim's head, two of which were simple and relatively small. She described the third as "a very large and complex wound."  She said the large wound was 2.4 inches long and that its top was almost square-shaped, which indicated that as compared with the other wounds, a different part of the same object or a different object was used to inflict the wound.  She said that there was a large area of skin torn from the skull as well as skull fractures, which she said almost certainly resulted from multiple blows.  She said that the skull is very difficult to open and that forceful blows would be required to create this type of injury.  She said there were fractures radiating "all across the head."  She said that the injury to the back of the head would have rendered the victim unconscious quickly but that it was difficult to tell whether the injuries to the side of the head would have done the same.  She said that she could not determine the order in which the injuries occurred but that the large one at the back of the head was the cause of death.  She noted that the victim died face-down.  She said that the cause of death was blunt head trauma due to multiple blows with a blunt object.

Dr. Mileusnic-Polchan testified that based upon her review of a photograph of the victim's body at the scene and the autopsy report, it was her opinion that the victim's body was face-down at the time of death but was later moved. Testifying from viewing a photograph of the victim's skull,

- 12 -

Dr. Mileusnic-Polchan said that some parts of the skull were driven into the brain by the force of the injury. From other photographs taken at the autopsy, she identified contusions on the victim's proximal upper arm and clustered on the back of the victim's right hand. She said that the right index finger was fractured and that the tissue was almost stripped off the finger. She said there was hair with blood on it entangled in the finger injury, which could mean the victim tried to protect her head. She said the clustered contusions on the back of the hand were "classic defensive wounds."

On cross-examination, Dr. Mileusnic-Polchan acknowledged that she could not say that the injuries were caused by a hammer, only that the injuries were consistent with a claw hammer. She admitted the possibility that the victim's hair became entangled in her broken finger when the body was moved. She said that due to the splitting of the victim's skin, it was unlikely that the associated injuries were inflicted when the victim was moving. She acknowledged that if the victim had been standing when some of the injuries occurred and had blood on her feet, the blood could have been removed if the victim's feet later became wrapped in a sheet or unwrapped from a sheet. She said that the victim would have been unconscious after all of the blows were inflicted.

Dr. Mileusnic-Polchan estimated that the injuries and the death occurred sometime between 7:00 and 10:00 a.m. She said the victim had cocaine residue in her urine but not in her blood.

[Petitioner] did not present any proof. The jury found [Petitioner] guilty of first degree murder.

*State v. Galindo*, No. E2009-00549-CCA-R3-CD, 2010 WL 4684469, at *1-10 (Tenn. Crim. App. Nov. 19, 2010) (footnote added), *perm. app. denied* (Tenn. Apr. 13, 2011).

Following the entry of Petitioner's judgment of conviction, Petitioner filed an untimely motion for new trial. *Id*. at *10. The trial court subsequently dismissed the motion as untimely.

On direct appeal, Petitioner asserted that: (1) the trial court erred in dismissing his motion for new trial on the basis it was untimely; (2) the evidence is insufficient to support his conviction; (3) the trial court erred in denying his pretrial motion to suppress his inculpatory statement; and (4) the trial court erred in denying his motion for a mistrial based upon the State's failure to disclose discovery materials in a timely manner. *Id*. at *1. Because Petitioner's motion for new trial was untimely, this court reviewed most of

Petitioner's issues for plain error. The court affirmed Petitioner's judgment of conviction, and the Tennessee Supreme Court denied further review. *Id*.

*Delayed direct appeal*

On February 27, 2011, Petitioner filed a timely petition for post-conviction relief, in which Petitioner requested that he be allowed to file a delayed direct appeal. *State v. Galindo*, No. E2020-00556-CCA-R3-CD, 2021 WL 270021, at *5 (Tenn. Crim. App. Jan. 27, 2021), *perm. app. denied* (Tenn. May 12, 2021). In a written order filed February 5, 2013, the post-conviction court granted Petitioner's request for a delayed direct appeal, finding that Petitioner was "denied full appellate review of his assignment of errors . . . because trial counsel failed to timely file a motion for new trial." The court appointed counsel to represent Petitioner, and Petitioner filed a delayed motion for new trial on March 1, 2013.[3] *Id*. at *5, *8.

As later summarized by this court in the delayed direct appeal, the evidence presented at the hearing on the delayed motion for new trial was, as follows:

> [T]rial counsel testified he was appointed to represent [Petitioner] prior to his preliminary hearing. Because trial counsel was fluent in Spanish, he did not have any problems communicating with [Petitioner]. Early in his representation, trial counsel filed a request for discovery, which he received from the prosecutor initially assigned to the case.
>
> As part of the pre-trial discovery, trial counsel received two police statements given by Ms. Swann, and he had no reason to believe she had given any additional statements. Trial counsel also spoke with Ms. Swann prior to trial, and she did not mention anything about seeing a hammer in [Petitioner's] apartment on the day before the murder. However, during her direct testimony, Ms. Swann testified she had seen a red claw hammer in [Petitioner's] apartment on the day before the murder. When trial counsel cross-examined Ms. Swann about why she had not disclosed this information to the police, Ms. Swann informed trial counsel that she had provided this information to the police. This was when trial counsel discovered Ms. Swann had given the police a third statement, which had not been disclosed to the defense. If he had received this statement at the proper time, trial counsel could have spoken with [Petitioner] about whether Ms. Swann's statement was true or whether [Petitioner] had seen the hammer anywhere else. On

---

[3] Although the delayed motion for new trial was filed in March 2013, the hearing on the motion was not held until October 2019. The reasons for this delay are not apparent from the record before us.

- 14 -

cross-examination, trial counsel agreed he could have asked Ms. Swann if she had seen a hammer in the apartment when he spoke with her prior to trial.

While preparing the defense, trial counsel attempted to speak with Mr. Leuty, but he refused to discuss the case. At trial, during cross-examination, Mr. Leuty testified he saw a mental health professional due to nightmares stemming from the trauma of discovering the victim's body. Following this disclosure, the State admitted they learned about Mr. Leuty's mental health issues the previous night but did not tell trial counsel. If trial counsel had been aware of Mr. Leuty's mental health issues the night before his testimony, he would have requested a continuance to obtain Mr. Leuty's medical records. Trial counsel would have reviewed the records to determine why Mr. Leuty was having mental health issues and to see if they resulted from Mr. Leuty's participation in the murder. Although trial counsel conceded he had no knowledge Mr. Leuty had ever confessed to participating in the murder, he noted that the police found Mr. Leuty's bloody handprint at the crime scene. On cross-examination, trial counsel conceded the trial court ruled Mr. Leuty's medical records were not relevant.

Regarding Ms. Koelzer, trial counsel received a copy of her police statements in discovery. Additionally, Ms. Koelzer spoke with trial counsel multiple times prior to trial. However, neither Ms. Koelzer nor her statements mentioned she had taken a polygraph examination in this case. During his cross-examination of Detective Huckleby, trial counsel asked to look at the report Detective Huckleby was reading from and noticed the report was several pages longer than the report trial counsel was given in discovery. Included in the longer report was information related to a failed polygraph examination by Ms. Koelzer. Trial counsel then requested permission to examine Detective Huckleby's investigation notebook and discovered Ms. Koelzer's polygraph examination report, which indicated she had been untruthful.

After the trial court was made aware of the polygraph report, which had been excluded from pre-trial discovery, the trial court ruled the State could not call Ms. Koelzer as a witness. Trial counsel testified this was "unfortunate" because he "kind of like[s] having a witness testify who's been lying about the murder." Her deception during the polygraph examination would give the jury the "possibility of another suspect." If trial counsel had the polygraph results prior to trial, he could have discussed it with her. Although trial counsel conceded the results of the examination would not be admissible at trial, Ms. Koelzer may have had a "Perry Mason moment" if

confronted with her deception and confessed to playing a role in the murder. On cross-examination, while trial counsel acknowledged he could have called Ms. Koelzer as a witness, he testified he did not "know that we ever had that conversation" because he was "neutral" toward her possible testimony. Trial counsel was also unsure whether he could ethically call Ms. Koelzer as a witness because he did not trust her after learning about the failed polygraph examination.

On cross-examination, trial counsel agreed [Petitioner] gave a statement admitting to hitting the victim with a hammer after an argument. He also acknowledged there was physical evidence presented at trial which corroborated [Petitioner's] statement. However, trial counsel insisted his investigation would have been different if he had been given Ms. Swann's statement, information regarding Mr. Leuty's mental health treatment, and the results of Ms. Koelzer's polygraph examination.

Philip Morton, the prosecutor at [Petitioner's] trial, testified he was assigned to [Petitioner's] case when the initial prosecutor, Jo Helm, left the District Attorney's Office. At that point, discovery had already been provided to [Petitioner], and Mr. Morton focused on preparing for trial.

Prior to trial, trial counsel filed a "notice of discovery in possession of the defense" which listed the items he had received from Ms. Helm. The notice listed several police reports but did not identify which reports they were. Instead, they were listed as "a one-page report, a two-page report, certain dates and so forth." In response, Mr. Morton filed a motion to clarify the exact discovery trial counsel possessed. When trial counsel specified which reports he had, the report numbers matched the ones in Mr. Morton's file, and he assumed trial counsel's discovery was complete. However, at trial, Mr. Morton learned that Detective Huckleby had updated one of his reports, and the new version had not been provided to either trial counsel or the State. On cross-examination, Mr. Morton testified it was possible Detective Huckleby generated a new report and did not give it to the State. Mr. Morton agreed it was the policy of the District Attorney's Office to turn over anything that was subject to discovery or that was potentially *Brady* material.

Mr. Morton was unsure why Ms. Koelzer was given a polygraph examination and could not recall whether she was considered a suspect in this case. He also could not recall whether Mr. Leuty or [Petitioner] were given polygraph examinations in regards to this case. Although he initially

testified he did not know about Ms. Koelzer's polygraph examination until trial, Mr. Morton later acknowledged it was possible he did know about the polygraph but did not attach significant weight to it because it would not be admissible at trial. Prior to the trial court's ruling that Ms. Koelzer could not be called as a State witness, Mr. Morton had intended to call her to testify regarding her knowledge of the crime and to ask whether she had any involvement in the murder. Upon questioning from the trial court, Mr. Morton agreed information regarding Ms. Koelzer's polygraph examination was something he would have provided to [Petitioner].

Regarding Ms. Swann's third police statement, Mr. Morton could not recall whether Detective Huckleby had reminded him of the fact that Ms. Swann had mentioned seeing the hammer in [Petitioner's] apartment, and Mr. Morton testified he was not trying to hide this information from [Petitioner].

On cross-examination, Mr. Morton testified he learned about Mr. Leuty's mental health issues the night before trial. Mr. Leuty contacted Mr. Morton and mentioned that he was seeing a mental health professional due to the trauma of having discovered the victim's body.

*Id*. at *6-8. At the conclusion of the hearing, the court denied Petitioner's delayed motion for new trial, and Petitioner appealed. *Id*. at *8.

On appeal, Petitioner asserted that the trial court erred in denying his motion for mistrial following the late disclosure of several discovery materials in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Petitioner argued that the State withheld information regarding Mr. Leuty's mental health treatment, Ms. Swann's third police statement, and the results of Ms. Koelzer's polygraph examination. *Id*. at *9-11. Upon review, this court concluded that Petitioner failed to prove he was prejudiced by any of the State's discovery violations. *Id*. at *11.

In addressing the delayed disclosure of Ms. Koelzer's polygraph examination, this court stated:

During the testimony of Detective Huckleby, trial counsel requested permission to review the detective's investigation notebook. Inside, trial counsel discovered a police report indicating Ms. Koelzer had failed a polygraph examination as well as the polygraph results. Following trial counsel's discovery, the trial court ruled that the fact that Ms. Koelzer had taken a polygraph and the results of the examination were not admissible for

- 17 -

any purposes. Additionally, the trial court held Ms. Koelzer's polygraph results were *Brady* material and should have been turned over prior to trial. Instead of granting [Petitioner's] request for a mistrial, the trial court held the State was not allowed to call Ms. Koelzer as a witness. However, although the trial court clarified that its ruling did not prevent the defense from calling Ms. Koelzer as a witness, trial counsel chose not to do so. At the motion for new trial hearing, trial counsel testified that if he had been given the polygraph results prior to trial, he could have discussed them with Ms. Koelzer. Although trial counsel conceded the results of the examination would not be admissible at trial, he believed Ms. Koelzer may have had a "Perry Mason moment" if confronted with the results and confessed to playing a role in the murder. When asked why he did not call Ms. Koelzer as a witness, trial counsel testified he no longer trusted her.

According to the polygraph report, during Ms. Koelzer's examination, the polygraph examiner detected an indication of deception to the following questions:

1. Regarding [the victim's] death, do you intend to answer truthfully all questions? (ANS: YES)

2. Did you participate in any way in causing [the victim's] death? (ANS: NO)

3. Did you lie about being asleep and not knowing that [the victim] was beaten? (ANS: NO)

4. Did you see [Petitioner] beat [the victim]? (ANS: NO)

We conclude the delayed disclosure of Ms. Koelzer's polygraph results was not prejudicial. Although a polygraph result is not admissible, this [c]ourt has previously held that a deceptive polygraph result is exculpatory. *See Lavely Brown v. State*, E2004-00886-CCA-R3-PC, 2005 WL 1882453, at *14 (Tenn. Crim. App. Aug. 8, 2005), *perm app denied* (Tenn. Dec. 19, 2005). Here, a polygraph examination indicated Ms. Koelzer might have been untruthful about her statements regarding her involvement in the victim's murder, and the State did not disclose this information to the defense. However, while the results of the polygraph are exculpatory, we conclude they are not material. The argument that this information could have changed trial counsel's strategy or produced a "Perry Mason moment" is not supported by the proof. [Petitioner] confessed to hitting the victim

- 18 -

with a hammer, and his DNA was discovered at the crime scene. No testimony presented at the trial or the motion for new trial hearing suggested that Ms. Koelzer had any involvement in the commission of the crime. Moreover, the results of the polygraph examination would not have been admitted at trial, and the jury would never have been able to hear them. Finally, while trial counsel was explicitly given permission to call Ms. Koelzer as a witness during trial, he chose not to do so. [Petitioner] is not entitled to relief on this issue.

*Id*. at *10-11. This court affirmed Petitioner's judgment of conviction, and the Tennessee Supreme Court denied further review on May 12, 2021. *Id*. at *1, *11.

### *Further post-conviction proceedings*

On May 5, 2022, Petitioner, through counsel, filed a petition for post-conviction relief[4] and supporting memorandum, asserting that he was denied the effective assistance of counsel at trial. The State filed a written response to the petition, denying Petitioner's allegations. At a subsequent hearing, the parties made arguments about their respective positions, but no additional proof was taken. The post-conviction court took the matter under advisement and then entered a written order denying relief. This timely appeal follows.

### **Analysis**

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a post-conviction court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. *Id*. (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015).

---

[4] Neither the record in this case nor the record in Petitioner's delayed direct appeal contains a copy of Petitioner's original post-conviction petition, in which he sought the delayed direct appeal. We note, however, that the State did not assert before the post-conviction court, and does not assert on appeal, that any of Petitioner's grounds for relief are waived or previously determined on the merits, and the post-conviction court specifically found in its preliminary order that the instant petition was not barred by the application of the one-petition rule. *See* Tenn. Code Ann. §§ 40-30-102(c), 40-30-106(g), (h) (2021).

When reviewing the post-conviction court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the [post-conviction] court." *Fields*, 40 S.W.3d at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Id*. (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936. Strategic decisions of counsel are given deference but only when such choices are informed ones based upon adequate preparation. *Id*. (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982); *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992)).

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

## *I. Failure to assert that Petitioner acted in self-defense*

Petitioner first contends that he received ineffective assistance of counsel based upon trial counsel's failure to assert a self-defense claim. Petitioner avers that "outside of [trial counsel's] opening remarks[,]" counsel "barely mentioned the crucial legal defense at all[,]" despite Petitioner's desire that counsel raise the defense. He insists that "[a] self-defense claim was not merely a strategic option" for trial counsel to employ but that it "was necessary to the proper presentation of [his] defense." The State responds that Petitioner's claim is waived. We agree with the State.

As noted by the State in its brief, Petitioner did not assert in his post-conviction petition, or in his supporting memorandum, that he was denied the effective assistance of counsel based upon trial counsel's failure to raise a claim of self-defense. Generally, issues not raised in the post-conviction petition are subject to waiver. *See, e.g., Foley v. State*, No. M2018-01963-CCA-R3-PC, 2020 WL 957660, at *7 (Tenn. Crim. App. Feb. 27, 2020) (citing *Angel v. State*, No. E2018-01551-CCA-R3-PC, 2019 WL 6954186, at *7 (Tenn. Crim. App. Dec. 18, 2019)), *no perm. app filed*. However, this court may extend appellate review to issues presented for the first time at the post-conviction hearing "if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020) (citations omitted).

Here, Petitioner presented no testimony about trial counsel's decision not to pursue a claim of self-defense, and the post-conviction court's written order did not address the issue. Accordingly, we conclude that the claim is waived. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) (stating that "[i]n the context of a post-conviction proceeding . . . an issue raised for the first time on appeal is waived").

## *II. Failure to call Ms. Koelzer as a witness at trial*

Petitioner also contends that the post-conviction court erred in denying relief on his claim that he received ineffective assistance of counsel based upon trial counsel's failure to call Ms. Koelzer as a witness at trial. Petitioner argues that, if trial counsel had called Ms. Koelzer to testify, her testimony would have presented the jury with "the possibility of another suspect being involved in the murder." The State responds that the post-conviction court did not err in denying relief as Petitioner failed to establish that trial counsel's decision not to call Ms. Koelzer to testify was deficient performance or that, but

for counsel's failure to call her as a witness, the results of the proceeding would have been different. We agree with the State.

In addressing Petitioner's claim that trial counsel rendered ineffective assistance when he failed to call Ms. Koelzer as a witness after learning that she failed a polygraph examination, the post-conviction court concluded that Petitioner failed to establish trial counsel's performance was deficient or resulted in prejudice. The court noted Petitioner's suggestion in his memorandum of law that Ms. Koelzer's deception during the polygraph examination "would potentially give the jury considering the case the possibility of another suspect being involved in the murder." The court rejected this argument, however, stating:

> First, both parties agreed pursuant to the record in this trial and the delayed motion for new trial that the polygraph examination report and its contents would generally not be admissible in trial. Second, and what weighs heavily against Petitioner's position is that the record reflects that Petitioner admitted to [Detective] Huckleby that he committed the homicide and articulated the method and manner of how he accomplished the homicide as well as where the instrumentalities were located. Additionally, weighing heavily against the theory that Ms. [Koelzer] could have been involved in the homicide, proof was offered by Special Agent Jennifer Millsaps of the Tennessee Bureau of Investigation. Special Agent Millsaps' testimony corroborated that Petitioner was physically on the scene of the homicide by his blood being present at various locations about the interior and exterior of the residence and at the victim's residence across the street.

> Further, there was no proof offered whatsoever in trial that Ms. [Koelzer] was complicit in the murder. The argument that Ms. [Koelzer] could have had a "Perry Mason moment" had she been called as a witness in trial and incriminate herself about involvement in the homicide is a long shot. Beyond that, trial counsel's decision not to call Ms. [Koelzer] as a witness in the trial given the circumstances regarding forensic proof and admissions by Petitioner himself cannot support the contention that Petitioner was deprived of a fair trial and the failure to call Ms. [Koelzer] as a witness called into question the reliability of the outcome.

The record does not preponderate against the post-conviction court's findings. *Fields*, 40 S.W.3d at 458. The record reflects trial counsel received a copy of Ms. Koelzer's police statements in discovery and that counsel spoke with her multiple times prior to trial. However, Ms. Koelzer failed to mention that she had taken a polygraph examination, and trial counsel testified that, when he learned this information during trial, he no longer trusted Ms. Koelzer, and it made it difficult for him to determine whether her testimony

would benefit Petitioner. Trial counsel made a reasonable tactical decision not to have Ms. Koelzer testify after considering the risks against the potential benefits of her testimony, and as noted by the State, strategic decisions by trial counsel are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Petitioner has not shown deficient performance on the part of trial counsel.

Moreover, Petitioner has failed to establish that, but for trial counsel's decision not to call Ms. Koelzer at trial, a reasonable probability exists that the outcome of the proceeding would have been different. To prove prejudice when trial counsel fails to call a witness at trial, a petitioner must present that witness at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate . . . what a witness's testimony might have been . . . ." *Id*. at 757. Because Petitioner failed to present Ms. Koelzer's testimony, the record supports the post-conviction court's determination that Petitioner did not establish prejudice under *Strickland*. Petitioner is not entitled to relief on this claim. *See id*. at 758 ("[T]he petitioner is not entitled to relief . . . unless he can produce a material witness who . . . would have testified favorably in support of his defense if called.").

## Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE